**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                        )
**BERNARD WAITHAKA, on behalf of**      )
**himself and others similarly situated,** )        **CIVIL ACTION**
                                        )
            **Plaintiffs,**             )        **NO. 18-40150-TSH**
                                        )
            **v.**                      )
                                        )
**AMAZON.COM, INC. and AMAZON**         )
**LOGISTICS, INC.,**                    )
                                        )
            **Defendants.**             )
_____ )

## ORDER AND MEMORANDUM ON DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO TRANSFER OR STAY

### August 20, 2019

**HILLMAN, D.J.**

Bernard Waithaka ("Plaintiff"), commenced this class action lawsuit against Amazon.com Inc., and Amazon Logistics Inc. ("Defendants") alleging improper classification as independent contractors and violations of state wage laws. Defendants have moved to compel arbitration or, in the alternative, to transfer or stay this litigation. (Docket No. 29) For the reasons stated below, Defendants' motion is ***granted*** in part and ***denied*** in part.

### Background

Plaintiff is a delivery driver for Defendants and classified as an independent contractor. As a result of that classification, Plaintiff (and other drivers similarly classified) must supply their own vehicles and pay expenses necessary to perform their jobs, such as insurance, gas, phone, and data plan. Consequently, Plaintiff alleges that his hourly wage fell below the minimum required by Massachusetts law.

The parties' agreement contained an arbitration agreement, which reads:

> YOU AND AMAZON AGREE TO RESOLVE DISPUTES BETWEEN YOU AND AMAZON ON AN INDIVIDUAL BASIS THROUGH **FINAL AND BINDING ARBITRATION**, UNLESS YOU OPT OUT OF ARBITRATION WITHIN 14 CALENDAR DAYS OF THE EFFECTIVE DATE OF THIS AGREEMENT, AS DESCRIBED BELOW IN SECTION 11.

(Docket No. 31-2, at 10) (emphasis in original). In addition, the agreement contained the following choice-of-law provision:

> **12. Governing Law.**
> The interpretation of this Agreement is governed by the law of the state of Washington, except for Section 11 of this Agreement, which is governed by the Federal Arbitration Act and applicable federal law.

(Docket No. 31-2, at 15).

## Discussion

Written arbitration agreements are governed pursuant to the Federal Arbitration Act. 9 U.S.C. §§1-301. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001) (holding that the FAA extends to employees other than transportation workers in employment cases). The FAA was enacted to combat "longstanding judicial hostility to arbitration agreements and to 'place such agreements upon the same footing as other contracts.'" *United States ex rel. Hagerty v. Cyberonics, Inc.*, 146 F. Supp. 3d 337 (D. Mass. 2015) (quoting *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 271 (1995)). When "construing an arbitration clause, courts and arbitrators must 'give effect to the contractual rights and expectations of the parties.'" *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quoting *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). The FAA institutes "a liberal federal policy favoring arbitration agreements" thus "establish[ing] . . . as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in

favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

### 1. FAA Transportation Worker Exemption

The FAA contains an exception for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Plaintiff contends that his employment as a last-mile delivery driver falls within this exception and consequently that the FAA does not apply.

In *Circuit City v. Adams*, the Supreme Court, interpreting the exemption, relied on the general principle of statutory interpretation *ejusdem generis*, which provides that general words following specific words in statutes should be interpreted to be similar in nature to the specific words they follow. 532 U.S. 105, 114-15 (2001). Accordingly, the Court held that "the residual clause should be read to give effect to the terms 'seamen' and 'railroad employees,' and should itself be controlled and defined by reference to the enumerated categories of workers which are recited just before it." *Id.* at 115. Therefore, the question presented is whether reading the residual clause to apply to last-mile delivery drivers gives effect to the enumerated categories of workers in the exception.

Although the Court narrowly interpreted the exemption, it did not provide any further guidance regarding which transportation workers fall within its scope. The First Circuit has not yet had the occasion to address how courts should interpret the residual clause. And "[a]lthough several other circuit courts throughout the country have addressed the topic, little consensus has been realized." *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 484 (S.D.N.Y. 2008). There is one area, however, where a consensus has emerged: truck drivers.[1] "[T]hat is, drivers actually

_____

[1] In *Oliveira v. New Prime, Inc.*, the First Circuit assumed, without deciding, that truck drivers engaged in interstate commerce fell within the scope of the residual clause. 857 F.3d 7, 17 (1st Cir. 2017) ("Prime does

involved in the interstate transportation of physical goods . . . have been found to be 'transportation workers' for purposes of the residuary exemption in Section 1 of the FAA." *Id.*; *see also Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 351 (8th Cir. 2005) ("Indisputably, if Lenz were a truck driver, he would be considered a transportation worker under § 1 of the FAA."); *Palcko v. Airborne Express*, 372 F.3d 588, 593-94 (3d Cir. 2004) (assuming that truck drivers fall within the scope of the exemption); *Harden v. Roadway Package Sys.*, 249 F.3d 1137, 1140 (9th Cir. 2001) ("As a delivery driver . . . Harden contracted to deliver packages 'throughout the United States, with connecting international service.' Thus, he engaged in interstate commerce that is exempt from the FAA."); *Carr v. Transam Trucking, Inc.*, 2008 WL 1776435, at *2 (N.D. Tex. Apr. 14, 2008) ("Truck drivers, like plaintiff, are considered 'transportation workers' within the meaning of this exemption."); *Veliz v. Cintas Corp.*, 2004 WL 2452851, at *5 (N.D. Cal. Apr. 5, 2014) ("The most obvious case where a plaintiff falls under the FAA exemption is where the plaintiff directly transports goods in interstate [commerce], such as [an] interstate truck driver whose primary function is to deliver mailing packages form one state into another.").

Unlike truck drivers engaged in interstate commerce, however, Plaintiff does not carry goods across state lines. Defendants argue that this distinction precludes application of the exemption to last-mile drivers. *See Magana v. Doordash, Inc.*, 343 F. Supp. 3d 891, 899 (N.D. Cal. 2018) (concluding exemption did not apply to a plaintiff who did "not allege that he ever crossed state lines as part of his work. As such, there is no allegation that he engaged in interstate commerce under the definition of the narrowly-construed term."). *Vargas v. Delivery Outsourcing, LLC*, 2016 WL 946112, at *4 (N.D. Cal. Mar. 14, 2016) (finding drivers not within the residual

---

not dispute that Oliveira, whose work for Prime included driving a truck across state lines, is a 'transportation worker' within the meaning of the § 1 exemption, as interpreted by *Circuit City*. Thus, we have no need to definitively decide that issue.").

exemption because the evidence did "not support the conclusion that Plaintiffs made interstate deliveries even occasionally."); *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1152 (N.D. Cal. 2015) (finding a driver who delivered prepared meals did not fall within the exemption because he did "not shown that he or any other similarly situated delivery driver ever made trips across state lines" and because the defendant did "not identify itself as being engaged in the interstate transport of goods . . . nor are the prepared meals Plaintiff delivers a type of good . . . that is 'indisputably' part of the 'stream of commerce.'").

The cases above, however, are distinguishable from the facts here. The plaintiffs in *Magana* and *Levin*, for instance, delivered prepared meals from local restaurants or merchants to local customers. *See Magana*, 343 F. Supp. 3d at 895; *Levin*, 146 F. Supp. 3d at 1154 ("[I]ngredients contained in the food that Plaintiff ultimately delivered from restaurants ended their interstate journey when they arrived at the restaurant where they were used to prepare meals."). Here, however, the goods do not stop and a restaurant where they are cooked and combined to create a new product. Instead there is a "continuity of movement" of the goods delivered by Amazon interstate until they reach customers. *See Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943) ("A temporary pause in their transit does not mean that [goods] are no longer 'in commerce' within the meaning of [the Fair Labor Standards Act]. As in the case of an agency if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until the reach the customers for whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce.").[2] In addition, in *Vargas*,

---

[2] Although *Walling* involved the Fair Labor Standards Act rather than the FAA, it does provide valuable guidance to interpret the phrase "engaged in commerce." *See also Merchants Fast Motor Lines, Inc. v.*

the plaintiff delivered delayed airline luggage to its owners. The luggage, however, "was not a 'good' to be delivered until it was delayed or lost by the airline and then discovered when it was already intrastate. Much like a food delivery service, a luggage delivery service is not engaged in interstate commerce because it is not in the business of shipping goods across state lines, even though it delivers good that once travelled interstate." *Rittmann v. Amazon.com, Inc.*, 2019 WL 1777725, at *3 (W.D. Wash. Apr. 23, 2019) (distinguishing delivery drivers in *Vargas* from last-mile delivery drivers for Amazon). Here, on the other hand, the goods are "goods" for their entire journeys across state lines.

Courts have also held that while physically transporting goods across state lines is a factor to be considered, it is not a necessary condition to the application of the residual exemption. *See Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 593-94 (3d Cir. 2004) ("[H]ad Congress intended the residual clause of the exemption to cover only those workers who physically transported goods across state lines, it would have phrased the FAA's language accordingly."); *Lenz v. Yellow Transp., Inc.*, 431 F.3d 348, 352 (8th Cir. 2005); *Bacashihua v. United States Postal Serv.*, 859 F.2d 402, 405 (6th Cir. 1988) (finding that the concern is "not whether the individual worker actual engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce"); *Christie v. Loomis Armored US, Inc.*, 2011 WL 6152979, at *3 (D. Colo. Dec. 9, 2011) ("[A]n employee need not actually transport goods across state lines to be part of a class of employees engaged in interstate commerce."). *But see Magana*,

---

*I.C.C.*, 5 F.3d 911, 917 (5th Cir. 1993) (holding that local drivers operate in interstate commerce "when a shipper ships goods into Texas from another state, temporarily stores the goods at a warehouse in Texas, then later ships the goods to the shipper's Texas customer" using local delivery drivers); *Ehrlich v. Rich Prod. Corp.*, 767 Fed. Appx. 845, 848 (11th Cir. 2019) ("We conclude that . . . the RSRs were engaged in interstate commerce when making their deliveries. Although the RSRs transported the products only in Florida, their deliveries were a part of a continuous stream of intestate commerce because there was a practical continuity of movement between the RSRs' deliveries to the retail stores and the overall interstate flow.").

343 F. Supp. 3d at 899 (finding exemption did not apply where plaintiff did "not allege that he ever crossed state lines as part of his work"). In *Palcko*, the plaintiff worked for Airborne, a package transportation and delivery company engaged in intrastate, interstate, and international shipping. 372 F.3d at 590. The plaintiff supervised truck drivers who "delivered packages from Airborne's facility near the Philadelphia International Airport to their ultimate destinations in the Philadelphia area, and picked up packages form customers in the Philadelphia area and brought them back to Airborne's facility for shipment." *Id.* Nonetheless, the Third Circuit held that the plaintiff fell within the residual exemption despite the fact there was no evidence that any of the drivers whom she supervised delivered packages across state lines because her work "was so closely related to interstate and foreign commerce as to be in practical effect part of it." *Id.* at 593.

In *Lenz*, the Eight Circuit provided the follow list of factors to assist courts in determining whether an employee fits within the § 1 exemption of the FAA:

> [F]irst, whether the employee works in the transportation industry; second, whether the employee is directly responsible for transporting the goods in interstate commerce; third, whether the employee handles goods that travel interstate; fourth, whether the employee supervises employees who are themselves transportation workers, such as truck drivers; fifth, whether, like seamen or railroad employees, the employee is within a class of employees for which special arbitration already existed when Congress enacted the FAA; sixth, whether the vehicle itself is vital to the commercial enterprise of the employer; seventh, whether a strike by the employee would disrupt interstate commerce; and eighth, the nexus that exists between the employee's job duties and the vehicle the employee uses in carrying out his duties.

431 F.3d at 352. Here, the Plaintiff clearly works in the transportation industry and handles goods that travel interstate. Further, the vehicle Plaintiff uses to deliver packages is vital to Amazon's commercial enterprise and central to Plaintiff's job duties.[3]

---

[3] It is true that Plaintiff does not supervise other employees, but as Plaintiff points out, this factor is meant to broaden the exemption to workers who do not directly engage in transporting goods. Consequently, the inapplicability of the fourth factor to Plaintiff does not preclude finding he falls within the scope of the exemption.

And while courts have held that crossing state lines is not necessary to apply the exemption, they have also held that transporting goods intrastate that have previously moved interstate can be sufficient to apply the exemption. *See, e.g.*, *Nieto v. Fresno Beverage Co. Inc.*, 33 Cal. App. 5th 274, 284 (2019) ("Nieto's deliveries, although intrastate, were essentially the last phase of a continuous journey of the interstate commerce . . . being transported until reaching its destination(s) to VWB's customers. Accordingly, as a delivery truck driver for VWB, Nieto was engaged in interstate commerce through his participation in the continuation of the movement of interstate goods to their destinations."); *Rittmann*, 2019 WL 1777725, at *3 (finding last-mile delivery drivers for Amazon within the residual exemption because Amazon is in the business of shipping good across state lines); *see also Lenz*, 431 F.3d at 352 (instructing courts to consider whether employees handle goods that travel in interstate). Thus, while last-mile drivers themselves may not cross state lines, they are indispensable parts of Amazon's distribution system. That system, of course, transports goods in interstate commerce. In the end, Plaintiff's employment, like the plaintiff in *Palcko*, is so closely related to interstate commerce as to be part of it.

In addition, courts have considered whether a strike by the employee would disrupt interstate commerce. *See, e.g.*, *Lenz*, 431 F.3d 348, 352. Here, I find that a strike by last-mile delivery drivers for Amazon would disrupt interstate commerce. Amazon is the largest online retailer in the United States, accounting for about half of the e-commerce market. *See* Docket No. 34-3. Accordingly, a strike would almost certainly interrupt interstate commerce. "A strike by Plaintiffs would be akin to local UPS or FedEx drivers striking—a strike by UPS or FedEx drivers, who only personally travel intrastate, would cause a ripple effect in interstate commerce because goods travelling interstate would still not make it to their final destination." *Rittmann*, 2019 WL

1777725, at \*4 (considering the effects of a strike by Amazon last-mile drivers).  Therefore, I find that Plaintiff falls within the Section 1 transportation worker exemption.

### 2.   *Choice of Law*

"Section 1 [of the FAA] does not, however, in any way address the enforceability of employment contracts exempt from the FAA.  It simply excludes these contracts from FAA coverage entirely." *Valdes v. Swift Transp. Co., Inc.*, 292 F. Supp. 2d 524, 529 (S.D.N.Y. 2003). Accordingly, "[w]hen a contract with an arbitration provision falls beyond the reach of the FAA, courts look to state law decide whether arbitration should be compelled nonetheless." *Breazeale v. Victim Servs., Inc.*, 198 F. Supp. 3d 1070, 1079 (N.D. Cal. 2016); *see also Shanks v. Swift Transp. Co.*, 2008 WL 2513056, at \*4 (S.D. Tex. June 19, 2008) ("While the FAA does not require arbitration, the question remains whether the exemption of Section 1 operates as a form of reverse preemption, so as to prohibit arbitration of the dispute altogether.  Plainly, it does not.  The weight of authority shows that even if the FAA is inapplicable, state arbitration law governs."); *Oliveira*, 857 F.3d at 24 (noting that the transportation worker exemption "applies only when arbitration is sought under the FAA, and it has no impact on other avenues (such as state law) by which a party may compel arbitration").

Plaintiff argues that the Court should either find the arbitration agreement unenforceable or find that Massachusetts law applies.  In *Rittmann*, the court found the plaintiffs were within the FAA's transportation worker exemption but was then unable to discern which state's law applied to govern the arbitration agreement.  Accordingly, the court held: "Because it is not clear what law to apply to the Arbitration Provision or whether the parties intended the Arbitration Provision to remain enforceable in the event that the FAA was found to be inapplicable, the Court finds that there is not a valid agreement to arbitrate." 2019 WL 1777725, at \*5.

Amazon contends that if federal law does not govern the arbitration agreement, the Washington choice-of-law provision requires the Court to apply Washington law. The choice-of-law provision reads:

> **12. Governing Law.**
> The interpretation of this Agreement is governed by the law of the state of Washington, except for Section 11 of this Agreement, which is governed by the Federal Arbitration Act and applicable federal law.

(Docket No. 31-2, at 15). The agreement, however, explicitly indicates that Washington *will not* apply to the arbitration agreement.[4] Had "the parties intended Washington law to apply if the FAA was found to be inapplicable, they would have said so or even remained silent on the issue. Instead, they did the opposite . . . [by] explicitly indicat[ing] that Washington law is not applicable to the Arbitration Provision. Indeed, it appears that it is precisely *against* the parties' intent to apply Washington law to the Arbitration provision." *Rittmann*, 2019 WL 1777725, at *5.[5] Accordingly, I find that Washington law does not apply.

---

[4] Amazon also argues that the severability provision nonetheless requires applying Washington law. That provision reads, in relevant part:

> **16. Entire Agreement and Severability; Survival**
> . . . If any provision of this Agreement is determined to be unenforceable, the parties intend that this Agreement be enforced as if the unenforceable provisions were not present and that any partially valid and enforceable provisions be enforced to the fullest extent permissible under applicable law.

(Docket No. 31-2, at PAGE). It is unclear, however, how the severability provision supports applying Washington law.

[5] In *Palcko*, for instance, the arbitration agreement read:

> Except as provided in this Agreement, the Federal Arbitration Act shall govern the interpretation, enforcement and all proceedings pursuant to this Agreement. *To the extent that the Federal Arbitration Act is inapplicable, Washington law pertaining to agreements to arbitrate shall apply.*

*Palcko*, 372 F.3d at 590 (emphasis added). If Amazon wanted Washington law to apply, it could have drafted a similar agreement. Thus, the court will not interpret the ambiguity here in Amazon's favor since it is responsible for the inartful drafting. *See Nadherny v. Roseland Prop. Company, Inc.*, 390 F.3d 44, 49 (1st Cir. 2004) (noting "the interpretive ground rule that ambiguous terms are usually to be construed against the drafter").

I also find, unlike in *Rittman*, the parties clearly agreed to arbitrate. The beginning of the agreement reads:

> YOU AND AMAZON AGREE TO RESOLVE DISPUTES BETWEEN YOU AND AMAZON ON AN INDIVIDUAL BASIS THROUGH **FINAL AND BINDING ARBITRATION**, UNLESS YOU OPT OUT OF ARBITRATION WITHIN 14 CALENDAR DAYS OF THE EFFECTIVE DATE OF THIS AGREEMENT, AS DESCRIBED BELOW IN SECTION 11.

(Docket No. 31-2, at 10) (emphasis in original). This provision evidences an intent to arbitrate independent of the choice-of-law provision. *See Diaz v. Michigan Logistics Inc.*, 167 F. Supp. 3d 375, 381 (S.D.N.Y. 2016) (finding that the "inapplicability of the FAA does not render the parties' arbitration provision unenforceable" because the "arbitration provision clearly demonstrates the parties' intent to arbitrate disputes").[6]

Accordingly, the Court must determine which state's laws apply. "A federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits." *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 571 U.S. 49, 65 (2013). "This applies to actions brought under the Class Action Fairness Act as well, since CAFA is based upon diversity jurisdiction." *In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155, 1167-68 (N.D. Cal. 2016) (quoting *In re NVIDIA GPU Litig.*, 2009 WL 4020104, at *5 (N.D. Cal. Nov. 19, 2009)). Because Amazon removed to this Court pursuant to CAFA, I will apply Massachusetts choice-of-law rules.

In choice of law matters, Massachusetts courts "look to [their] established 'functional' choice of law principles and to the Restatement (Second) of Conflict of Laws, with which those principles generally are in accord." *Hodas v. Morin*, 814 N.E.2d 320, 324 (Mass. 2004). Pursuant

---

[6] In *Diaz*, the agreement read: "this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law, and therefore this Arbitration Provision requires all such disputes to be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial." 167 F. Supp. 3d at 381.

to the Restatement, "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6." Restatement (Second) Conflict of Laws § 145(1).[7] Accordingly, the Restatement instructs courts to consider the following factors when making that determination: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." Restatement (Second) Conflict of Laws § 145(2).[8]

Applying these factors to the facts of this case, the Court will apply Massachusetts law. As Plaintiff notes, "all critical facts concerning [his] work occurred in Massachusetts." (Docket No. 33, at 15).

### 3. Application of Massachusetts Law

"Where, as here, the plaintiff[ ] challenge[s] the enforceability of a class action prohibition embedded in a binding arbitration clause, they are 'plainly' challenging 'the validity of the parties' agreement to arbitrate,' and a court is the appropriate forum for such a challenge." *Feeney v. Dell*

---

[7] Section 6 instructs courts to consider "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied"). Restatement (Second) Conflict of Laws § 6.

[8] The Supreme Judicial Court has observed that wage laws sound in tort since they "effectuate[ ] a jurisdiction's interest in regulating behavior within its borders." *Melia v. Zenhire, Inc.*, 967 N.E.2d 580, 591 (Mass. 2012) (quotation marks and citation omitted); *see also* Black's Law Dictionary 1626 (9th ed. 2009) (defining "tort" as "civil wrong, other than breach of contract, for which a remedy may be obtained"). Other courts have interpreted Wage Act violations as sounding in contract and consequently applied the factors outlined in Restatement (Second) Conflicts of Laws § 188. *See, e.g., Krause v. UPS Supply Chain Solutions, Inc.*, 2009 WL 3578601, at *5 (D. Mass. Oct. 28, 2009); *Lockley v. Studentcity.com, Inc.*, 2018 WL 6933374, at *3 (Mass. Sup. Ct. Dec. 5, 2018). Regardless, if the Court were to apply the factors set forth in Section 188, all roads in this case lead back to the Commonwealth.

*Inc.*, 908 N.E.2d 753, 761 (Mass. 2009) (*Feeney I*) (quoting *In re Am. Express Merchants' Litig.*, 554 F.3d 300, 311 (2d Cir. 2009)).

Massachusetts courts generally respect parties' freedom to contract. *Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc.*, 662 N.E.2d 1015, 1017 (Mass. 1996); *see also* E.A. Farnsworth, Contracts § 5.1, at 345 (2d ed. 1990) (noting that freedom to contract "rests on the premise that it is in the public interest to accord individuals broad powers to order their affairs through legally enforceable agreements"). Nevertheless, that freedom is not absolute "for government cannot exist if the citizen may at will . . . exercise his freedom of contract to work . . . harm [to his fellow citizens]. Equally fundamental with the private right is [the right] of the public to regulate it in the common interest." *Commonwealth v. Henry's Drywall Co.*, 320 N.E.2d 911, 915 (Mass. 1974). Thus, "it is a principle universally accepted that the public interest in freedom of contract is sometimes outweighed by public policy, and in such cases the contract will not be enforced." *Beacon Hill*, 662 N.E.2d at 1017. In this context, public policy "refers to a court's conviction, grounded in legislation and precedent, that denying enforcement of a contractual term is necessary to protect some aspect of the public welfare." *Id.*

The Supreme Judicial Court has made clear that class action waivers embedded in arbitration agreements may violate public policy. In *Feeney I*, for instance, the SJC declined to enforce a prohibition on class actions in an arbitration agreement for several public policy reasons. First, permitting the class action waiver would "undermine[ ] the public interest in deterring wrongdoing" because requiring plaintiffs to proceed in individual arbitration would effectively bar recovery. 908 N.E.2d at 765; *see also Salvas v. Wal-Mart Stores, Inc.*, 893 N.E.2d 1187, 1215 (Mass. 2008) ("Class actions were designed not only to compensate victimized group members, but also deter violations of the law, especially when small individual claims are involved."

(quoting 2 A. Conte & H.B. Newberg, Class Actions § 4.36, at 314 (4th ed. 2002))); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("It would hardly be an improvement to have in lieu of this single class action 17,000,000 suits each searching damages of $15.00 to $30.00. . . . The *realistic* alternative to a class action is not 17,000,000 individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.00."). Second, the legislative history of Section 93A demonstrates "a strong public policy in favor of the aggregation of small consumer protection claims." 908 N.E.2d at 762; *see also id.* at 762-63 (describing the legislative history of Section 93A). Third, "the loss of an individual consumer's right to bring a class action negatively affects the rights of those unnamed class members on whose behalf the class action would proceed. In this sense, the right to participate in a class action under G.L. c. 93A is a public—not merely a private—right: it protects the rights of consumers as a whole." *Id.* at 764.

After *Feeney I* was decided, the Supreme Court, in *AT&T Mobility LLC v. Concepcion*, held that the FAA preempted California's rule that class waivers in arbitration agreements were unconscionable. 563 U.S. 333, 352 (2011). The SJC subsequently concluded that that "*Feeney I* survive[d] *Concepcion* to the extent that a consumer plaintiff 'can demonstrate that he or she effectively cannot pursue a claim against a defendant in individual arbitration according to the terms of the arbitration agreement.'" *Machado v. System4 LLC*, 989 N.E.2d 464, 470 (Mass. 2013) (brackets omitted) (quoting *Feeney v. Dell Inc.*, 989 N.E.2d 439, 441 (Mass. 2013) (*Feeney II*)). [9]

---

[9] The Supreme Court's subsequent decision in *American Express Co. v. Italian Colors Restaurant*, however, clarified that class action waivers in arbitration agreements are enforceable under the FAA even if a plaintiff demonstrates the waiver effectively precludes him or her from vindicating statutory rights. 570 U.S. 228, 238-39 (2013). Accordingly, the SJC since recognized that "*Concepcion* is not entitled to the reading we afforded it in *Feeney II* and that the analysis the Court set forth in *Concepcion* (and reinforced in *Amex*) applies without regard to whether the claim sought to be vindicated arises under Federal or State law." *Feeney v. Dell Inc.*, 993 N.E.2d 329, 331 (Mass. 2013) (*Feeney III*).

In other words, only the first rationale noted above would permit courts to invalidate class waivers in arbitration agreements where the FAA applied.

In *Machado*, the SJC assessed the validity of a class action waiver in an arbitration agreement in the context of a Wage Act claim. The Court noted that that there was "no principled reason to limit *Feeney I* . . . to consumer claims under G.L. c. 93A, because many of the same public policy arguments apply equally well to claims by employees under the Wage Act." 989 N.E.2d at 470. In that case, however, the plaintiff's claims were not small. *See id.* at 471 ("Unlike the plaintiffs in *Feeney II*, whose claimed damages totaled $13.65 and $215.55, respectively, the individual plaintiffs here claim damages that, in the form of improper franchise fees alone, total $21,818.38, $17,227,93, $14,949.73, and $9,541.83, respectively."). Consequently, individual arbitration did not bar them from recovery as a practical matter, and—because the first rationale did not apply—the SJC was forced to uphold the class waiver.

Importantly, the SJC noted that, while the second rationale applied with equal force to Wage Act claims, it was "of no avail." *Id.* at 470. The SJC recognized "the very legitimate policy rationales underlying the Legislature's decision to provide for class proceedings under the Wage Act, nor are we blind to the fact that the Legislature may find its purposes frustrated by this outcome." 989 N.E.2d at 470-71 (citation omitted); *see also* Mass. Gen. Laws ch. 149, § 150 ("An employee claiming to be aggrieved by a violation of [the Wage Act] may . . . institute and prosecute in his own name and on his own behalf, or for himself and others similarly situated, a civil action."). Further, the third rationale also applies with equal force. "[T]he loss of an individual [employee's] right to bring a class action negatively affects the rights of those unnamed class members on whose behalf the class action would proceed. In this sense, the right to participate in

a class action under [the Wage Act] is a public—not merely a private—right: it protects the rights of [workers] as a whole." *Feeney I*, 908 N.E.2d 753.

Amazon argues that that *Feeney I* and *Machado* are inapposite because the public policy rationales in those cases only applies when cases brought on an individual basis would be prohibitively expensive for plaintiffs and consequently chill enforcement. Amazon notes that here Plaintiff has asserted that his individual damages are nearly $14,000. (Docket No. 44, at 11). The SJC concluded, however, that *where the FAA applies* class action waivers can only be invalidated if a plaintiff is, as a practical matter, precluded from vindicating his or her rights in individual arbitration. *See Feeney II*, 989 N.E.2d at 455 ("We do not interpret the FAA so broadly as to deny a consumer any remedy, nor do we discern any such congressional intent. A State court's invalidation [where plaintiffs are effectively precluded from obtaining a remedy] survives not because it can be harmonized with the FAA, but because the FAA does not conflict with such a ruling and therefore does not preempt it."). Here, as noted above, the FAA does not apply because Plaintiff's employment as a last-mile driver falls within the scope of the Section 1 transportation worker exemption. Accordingly, the Supreme Court's holdings in *Concepcion* and *American Express* do not narrow state public policy rationales for prohibiting class action waivers in arbitration agreements. The requirement that plaintiffs must be effectively precluded from obtaining relief was a necessary condition to evade arbitration where the FAA governed the agreement based on the SJC's reading of *Concepcion*. *See Machado*, 989 N.E.2d at 470. It is not necessary here.

The Wage Act itself evidences an intent to permit plaintiffs to proceed as a class. Further, precluding class adjudication would negatively impact unnamed class members, especially those

who may have smaller claims than Plaintiff.  Because the FAA does not apply, these public policy rationales are is sufficient to invalidate the agreement.

### 4.  Transfer or Stay

Amazon argues that the Court should transfer this case based on the so-called "first-to-file" rule.[10]  Alternatively, Amazon contends that the Court should transfer this case to the Western District of Washington under 28 U.S.C. § 1404(a) or stay the action.  I find Amazon's arguments with respect to Section 1404 unconvincing.  Nonetheless, transfer is warranted pursuant to the so-called "first-to-file" rule.

### a.  Section 1404

Amazon next contends that this case should be transferred pursuant to Section 1404.  Under Section 1404(a), a court may transfer any civil action to any other district where it may have been brought "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a).  In addition to convenience, courts must consider "various public-interest considerations." *Atl. Marine*, 571 U.S. at 62.  Courts typically separate the relevant factors into public and private

---

[10] At least one district court in the First Circuit has declined to apply the rule because it is not well-established within this circuit. *See e.g.*, *Angela Adams Licensing, LLC v. Dynamic Rugs, Inc.*, 463 F. Supp. 2d 82, 86 (D. Me. 2006) (declining to apply the first-to-file rule where "[the defendant] does not cite, and I am unaware of, any First Circuit case law suggesting that the 'first-to-file' rule is well-settled law in this circuit.  Furthermore, where recognized, the first-to-file rule is a matter of trail court discretion").  Other courts have concluded that the first-to-file rule is a factor to be considered in a Section 1404 analysis, but not alone sufficient to warrant transfer. *See Hecker v. Petco Animal Supplies, Inc.*, 2017 WL 2461564 at *3 (N.D. Ill. June 7, 2017) ("[T]he first-filed status of a particular suit, while relevant, is never dispositive of a party's request to dismiss, transfer, or stay a second-filed suit.  Other district courts in [the Seventh Circuit] have adopted this approach, considering the first-filed nature of a suit in light of the other considerations relevant under § 1404(a), and have refrained from dismissing second-filed, related suits.").

Because several sessions of this Court have applied the rule, however, I will assume that Amazon may seek transfer under the first-to-file rule. *See e.g.*, *World Energy Alternatives, LLC v. Settlemyre Industries, Inc.*, 671 F. Supp. 2d 215, 218 (D. Mass. 2009).  Further, the First Circuit has recognized the "obvious concerns" that arise "when actions involving similar subject matter are pending in different federal district courts" and emphasized that where "the overlap between the two suits is nearly complete, the usual practice is for the court that first had jurisdiction to resolve the issues and the other side to defer." *TPM Holdings, Inc. v. Intra-Gold Industries, Inc.*, 91 F.3d 1, 4 (1st Cir. 1996).

categories. 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3847 (4th ed.). "Factors relating to the parties' private interests include 'relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Atl. Marine*, 571 U.S. at 62 n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)). "Public-interest factors may include 'the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided and home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law.'" *Id.* (quoting *Piper*, 454 U.S. at 241 n.6). "The Court must also give some weight to the plaintiffs' choice of forum." *Id.*

Amazon argues that convenience of the parties and witnesses supports transfer. According to Amazon, transfer to Washington "would be substantially more convenient for the many witnesses who otherwise would be forced to testify about similar claims in two separate actions pending at opposite ends of the country." (Docket No. 30, at 19). General proffers that convenience dictates transfer, however, is not sufficient. *See Princess House, Inc. v. Lindsey*, 136 F.R.D. 16, 18 (D. Mass. 1991) ("A party seeking transfer on this basis [convenience] must, therefore, specify the key witnesses to be called, accompanied by a general statement as to what their testimony will entail."). *Cf. Montoya v. CRST Expedited, Inc.*, 285 F. Supp. 3d 493, 501 (D. Mass. 2018) (declining to transfer where "the convenience factor remains difficult to evaluate because the witness list is not clear").

### b. First-to-File

Under the first-to-file rule, "where the overlap between two suits is 'nearly complete,' the usual practice is for the court where the case was first filed to resolve the issues, and the other court to defer by either staying, transferring, or dismissing the action." *Thakkar v. United States*, 2019 WL 1993782, at *5 (D. Mass. May 6, 2019) (quoting *TPM Holdings v. Intra-Gold Indus.*, 91 F.3d 1, 4 (1st Cir. 1996)); *see also In re Telebrands Corp.*, 824 F.3d 982, 984 (Fed. Cir. 2016) (noting that the first-to-file "rule stands for the common sense proposition that, when two cases are the same or very similar, efficiency concerns dictate that only one court decide both cases"). When deciding whether to apply the rule, courts must consider: (1) which action was filed first; (2) the similarity of the parties; and (3) the similarity of the issues. *See Alltrade, Inc. v. Uniweld Prod., Inc.*, 946 F.2d 622, 625 (9th Cir. 1991).

However, "the first-to-file rule is not to be applied in a mechanical way. *EMC Corp. v. Parallel Iron, LLC*, 914 F. Supp. 2d 125, 127 (D. Mass. 2012). "By assessing the appropriateness of the first-filed rule on a case-by-case basis, without reference to rigid requirements regarding similarities between parties and claims, courts may exercise their discretion to promote efficiency and comity." *Palagano v. NVIDIA Corp.*, 2015 WL 5025469, at *2 (E.D. Pa. Aug. 25, 2015). For instance, "it is not unusual that class actions are resolved by settlement, and the settlement process can be complicated and made burdensome, and even frustrated, if two courts are attempting to deal with" the same subject matter. *Byerson v. Equifax Information Servs.*, 467 F. Supp. 2d 627, 636 (E.D. Va. 2006). "Thus, even if the claims in two separate class actions do not involve identical parties, it would be extremely difficult to ignore the efficiency gains that might result form consolidation." *Palagano*, 2015 WL 5025469, at *2. Further, "if application of the first-filed rule required complete identity of issues and parties, then defendants in the first-filed action may be incentivized to forum shop and commence similar but nonidentical actions in other venues,"

resulting in duplicative litigation and potentially inconsistent rulings. *Sinclair Cattle Co. Inc. v. Ward*, 80 F. Supp. 3d 553, 559 (M.D. Penn. 2015).

"Courts that transfer wage and hour actions under the first-filed rule generally do so when the collective identified in a state-law based second-filed action falls within the scope of a nationwide FLSA collective asserted in the first filed action." *Lloyd v. J.P. Morgan Chase & Co.*, 2012 WL 3339045, at * 2 (S.D.N.Y. Aug. 14, 2002).[11] For instance, in *Fryda v. Takeda Pharmaceuticals North America*, No. 1:11-cv-00339, 2011 WL 1434997 (N.D. Ohio Apr. 14, 2011), the plaintiffs in the second-filed suit alleged violations of Ohio wage laws and proposed a class composed entirely of Ohio citizens. Applying the first-filed rule, the court transferred the case, noting that the plaintiffs in the second-filed suit were a subset of the larger class and that the Ohio state law and federal statutes applied the same standards. *Id.* at *5.

On the other hand, in *Wilkie v. Gentiva Health Servs.*, 2010 WL 3703060 (E.D. Cal. Sep. 16, 2010), the first-filed action was brought in the Eastern District of New York, on behalf of a putative nationwide FLSA collective, and also North Carolina and New York subclasses. *Id.* at *1. The later-filed action was brought against the same defendant in the Eastern District of California and was also brought on behalf of a nation-wide collective, and also a California class. *Id.* at *1-2. The court declined to transfer pursuant to the first-to-file rule because the "California class is separate and distinct from any and all [of the first-filed actions] sub classes." *Id.* at *4. *But see Palagano v. NVIDIA Corp.*, 2015 WL 5025469 (E.D. Pa. Aug. 25, 2015) (applying first-to-file rule where later-filed action on behalf of a class of Pennsylvania residents and the first-filed action was brought on behalf of a nationwide collective, with subclasses representing several states but

---

[11] Multi-plaintiff actions under the FLSA are governed by 29 U.S.C. § 216(b) and are called "collective" or "representative" actions rather than class actions. Despite the difference in terminology, collective actions are like class actions insofar as they address a similar alleged wrong suffered by a group of similarly situated plaintiffs.

not Pennsylvania). Further, the *Wilke* court concluded that the "California law claims are dissimilar from both the [first-filed] action's FSLA claim and the North Carolina and New York state law claims." *Wilkie*, 2010 WL 3703060, at *4.

Here, I find that the parties are substantially similar. Defendants in both cases are identical and Plaintiff is—as well as other members of the putative Massachusetts class—are subsumed within the nationwide FLSA action in *Rittmann*. *See Fryda*, 2011 WL 1434997, at *5; *Weinstein v. Metlife, Inc.*, No. 06-04444, 2006 WL 3201045, at *4 (N.D. Cal. Nov. 6, 2006) ("In a class action . . . it is the class, not the representative, that is compared" when deciding whether to apply the first-to-file rule). It is true that the putative class in this action is composed entirely of Massachusetts citizens and, like in *Wilkie*, is entirely distinct from the California and Washington subclasses in *Rittman*. *Cf. Hoyt v. Amazon.com, Inc.*, 2019 WL 1411222, at *5 (N.D. Cal. Mar. 28, 2019) (finding similarity of the parties and granting motion to transfer to the *Rittmann* court where second action was entirely composed of a California class and the putative class in *Rittmann* had a California subclass). However, I do not agree that mutually exclusive subclasses preclude finding them similar. *See e.g.*, *Granillo v. FCA U.S. LLC*, 2016 WL 8814351, at *4 (C.D. Cal. 2016) (finding parties similar where two class actions involved same defendant and mutually exclusive classes); *Cadenasso v. Metropolitan Life Ins. Co.*, 2014 WL 1510853, at *10 (N.D. Cal. Apr. 15, 2014) (same). The first-to-file rule only requires similar parties, not identical ones. That requirement is satisfied here.

The issues are also substantially similar. In both actions, the plaintiffs allege that Amazon failed to pay minimum wages and reimburse business expenses. Indeed, many of the statements in Plaintiff's complaint "track[ ], virtually verbatim, statements form the complaint in the [*Rittmann*] action. *Wiley v. Gerber Prod. Co.*, 667 F. Supp. 2d 171, 172 (D. Mass. 2009) (granting

motion to transfer).  And while Plaintiff does raise Massachusetts state law claims, the "[m]inor differences in potential damage relief between the FLSA and the Massachusetts state labor laws are insignificant for purposes of this analysis." *Mazzantini v. Rite Aid Corp.*, 829 F. Supp. 2d 9, 11 (D. Mass. 2011) (transferring Wage Act claim to the Middle District of Pennsylvania).  Further, the Western District of Washington "is entirely capable of addressing the Massachusetts state law claims raised here." *Id.*

## Conclusion

For the reasons stated above, Amazon's motion is ***granted*** in part and ***denied*** in part.  I find that Plaintiff falls within the FAA's transportation worker exemption and that the arbitration agreement is unenforceable under Massachusetts law.  Finally, pursuant to the first-to-file rule, I find that transfer to the Western District of Washington is warranted.

**SO ORDERED**

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**