# Exhibit 4

**COMMONWEALTH OF MASSACHUSETTS**
**SUPREME JUDICIAL COURT**

No. SJC-11653

-------------------------------------------------

CLAYTON SCHWANN et al.

Plaintiffs,

v.

FEDEX GROUND PACKAGE SYSTEM, INC.

Defendant

-------------------------------------------------

On Certified Questions from the United States
District Court for the District of Massachusetts

-------------------------------------------------

**PLAINTIFFS' REPLY BRIEF**

Harold L. Lichten, BBO #549689
Shannon Liss-Riordan, BBO#640716
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
(617) 994-5800

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...................................ii

SUMMARY OF ARGUMENT....................................1

ARGUMENT..............................................3

    I.   DEDUCTIONS.................................3

        A.   The Burden Lies with FedEx to
           Prove that Each Deduction Is a
           Valid Setoff.........................3

        B.   Although FedEx Claims it Could
           Lawfully Deduct Certain Insurance
           Premiums under M.G.L. c. 152, FedEx
           Fails to Show that Any Plaintiff Had
           Workers' Compensation Insurance.......4

    II.  EXPENSES..................................6

        A.   The Plaintiffs' Right to Receive
           their Full Earned Wages "Free and
           Clear" Is Not New....................8

        B.   The Right to Recover Out of Pocket
           Expenses Is Not Standardless or
           Amorphous...........................15

        C.   FedEx Argues for a Theory of Damages
           that Runs Entirely Counter to the
           Well-Established Damages Principles
           of Somers...........................19

CONCLUSION...........................................20

CERTIFICATE OF COMPLIANCE............................21

CERTIFICATE OF SERVICE...............................22

ADDENDUM.............................................23

## TABLE OF AUTHORITIES

**CASES**

Adams v. Tanner,
  244 U.S. 590 (1917)...................................9

Arriaga v. Florida Pacific Farms, LLC,
  305 F.3d 1228 (11th Cir. 2002)............2, 16, 17

Awuah v. Coverall North America, Inc.,
  740 F. Supp. 2d 240 (D.Mass. 2010)..............5, 9

Awuah v. Coverall North America, Inc.,
  460 Mass. 484 (2011)........................passim

Awuah v. Coverall North America, Inc.,
  2012 WL 910260 (D. Mass. Mar. 15, 2012)....8, 10, 14

Bailey v. Pilots' Ass'n for Bay and River
Delaware, 406 F. Supp. 1302 (E.D. Penn. 1976).......17

Brennan v. Modern Chevrolet Co.,
  363 F. Supp. 327 (N.D. Texas 1973)...............17

Camara v. Attorney General,
  458 Mass. 756 (2011)....................1, 3, 13

Cooney v. Compass Grp. Foodservice,
  69 Mass.App.Ct. 632 (2007)...................11, 19

Crocker v. Townsend Oil Co., Inc.,
  464 Mass. 1 (2012)..........................14, 15

De Leon-Granados v. Eller & Sons Trees, Inc.
  581 F. Supp. 2d 1295 (N.D. Georgia 2008).........17

De Luna-Guerrero v. North Carolina Grower's Ass'n,
  Inc., 338 F. Supp. 2d 649 (E.D.N.C. 2004).........2

Garcia v. Frog Island Seafood, Inc.,
  644 F. Supp. 2d 696 (N.D.N.C. 2009).............17

Martins v. 3PD, Inc.,
  2014 WL 1271761 (D. Mass. Mar. 27, 2014).......1, 4

Perrin v. Papa John's Inter., Inc.,
    2013 WL 6885334 (E.D. Mo. Dec. 31, 2013)..........18

Rivera v. Brickman Group, Ltd.,
    2008 WL 81570 (E.D. Pa. Jan. 7, 2008).............17

Salazar-Martinez v. Fowler Bros., Inc.,
    781 F.Supp.2d 183 (W.D.N.Y. 2011)..........2, 7, 17

Smith v. Winter Place LLC.,
    447 Mass. 363 (2006)...............................8

Somers v. Converged Access, Inc.,
    454 Mass. 582 (2009).....................11, 19, 20

Talk America, Inc. v. Michigan Bell Tel. Co.,
    131 S.Ct. 2254 (2011).............................9

**STATUTES**

M.G.L. c. 149, § 148B............................5, 6

M.G.L. c. 149, § 150.........................1, 3, 10

M.G.L. c. 151, 1A(8)..............................13

M.G.L. c. 152...................................1, 4

M.G.L. c. 154, § 8.................................4

29 U.S.C. § 213...................................13

**REGULATIONS**

29 C.F.R. § 531.32................................16

29 C.F.R. § 531.35.........................9, 17, 18

29 C.F.R. § 778.217..............................19

Brief of Amicus Curiae the Commonwealth of
    Massachusetts, 2006 WL 6814449 (R. 279-328),
    in Awuah v. Coverall North America, Inc.,
    460 Mass. 484 (2011)..............................8

## SUMMARY OF ARGUMENT

FedEx cannot show, nor has it even alleged, that any of the deductions it made from the Plaintiffs' wages constitute valid set-offs under M.G.L. c. 149, §150 – the only defense available to FedEx.  Instead, FedEx attempts to shift the burden onto the Plaintiffs to prove that each individual deduction is unlawful, despite clear caselaw to the contrary. Camara v. Attorney General, 458 Mass. 756, 760 (2011) ("there can be no deduction from wages unless the employer can demonstrate … the existence of a valid … setoff as described in § 150.").

In addition, FedEx's sole argument with respect to workers' compensation insurance deductions fails because FedEx has not even shown that any Plaintiff obtained workers compensation insurance covered by M.G.L. c. 152; rather, the Plaintiffs were required to obtain "work accident" insurance, which was simply another insurance cost that FedEx was prohibited from deducting from the Plaintiffs' wages, just as Coverall and 3PD were in Awuah v. Coverall North America, Inc., 460 Mass. 484 (2011), and Martins v. 3PD, Inc., 2014 WL 1271761 (D. Mass. Mar. 27, 2014).

1

Likewise, the "special contract" language in the Wage Act also prohibits FedEx from requiring the Plaintiffs to pay FedEx's ordinary business costs out of their own pockets, because doing so reduces the Plaintiffs' wages just as effectively as if FedEx deducted the cost of the expense from the Plaintiffs' wages.[1]  This Court squarely addressed the issue in Coverall, when it held that out-of-pocket payments (and not just deductions from wages) for franchise fees and insurance premiums were prohibited under the Wage Act.  460 Mass. at 496-99, 497 n. 22.  FedEx's argument that it would be impossible to decide which expenses are recoverable is not true, since many courts have addressed this precise issue (determining what expenses are "for the benefit of the employer") under the federal Fair Labor Standards Act.  FedEx has

---

[1]    See Salazar-Martinez v. Fowler Bros., Inc., 781 F.Supp.2d 183, 197 (W.D.N.Y. 2011) (holding that "an employer may not require an employee to bear an expense … that is primarily for the employer's benefit" under state wage law that "prohibit[s] wage deductions by indirect means where direct deduction would violate the statute."); De Luna-Guerrero v. North Carolina Grower's Ass'n, Inc., 338 F. Supp. 2d 649, 656 (E.D.N.C. 2004) ("there is no legal difference between deducting a cost directly from the worker's wages and shifting a cost, which they could not deduct, for the employee to bear") (quoting Arriaga v. Florida Pacific Farms, LLC, 305 F.3d 1228, 1236 (11th Cir. 2002)).

2

failed to meet its burden of showing that any of the
challenged business costs that Plaintiffs paid through
deductions and out-of-pocket payments were allowed
under the Wage Act, and this Court should find that
all such deductions and expenses are prohibited by the
Wage Act.

**ARGUMENT**

I.   **DEDUCTIONS**

A.   **The Burden Lies with FedEx to Prove that
     Each Deduction Is a Valid Setoff**

FedEx's brief is premised on the incorrect
assertion that it is Plaintiffs' burden to prove that
each individual deduction at issue in this case is
unlawful, when in fact the plain language of the Wage
Act places the burden squarely on FedEx to prove each
deduction is lawful: "[o]n the trial no defence for
failure to pay as required, other than … a valid set-
off … shall be valid." M.G.L. c. 149, § 150.[2]  Yet
FedEx has not even attempted to meet this burden.  Nor
could FedEx possibly show that any of the deductions
it made from the Plaintiffs' wages were valid set-

_____

[2]   See also Camara, 458 Mass. at 760 ("there can be
no deduction from wages unless the employer can
demonstrate, in relation to that employee, the
existence of a valid attachment, assignment or setoff
as described in § 150.").

3

offs, because they do not fall within the expressly permissible deductions set forth in M.G.L. c. 154, §8. See Coverall, 460 Mass. at 496 (only deductions "made in furtherance of an employee's interests" are permissible under M.G.L. c. 154, § 8).

    B.    Although FedEx Claims it Could Lawfully
          Deduct Certain Insurance Premiums under
          M.G.L. c. 152, FedEx Fails to Show that Any
          Plaintiff Had Workers Compensation Insurance

FedEx's sole defense for deducting the cost of "workers' compensation" insurance from the Plaintiffs' wages is that the Plaintiffs have not shown that they are employees under M.G.L. c. 152, yet FedEx's entire argument is flawed because there is no evidence that any Plaintiff paid for workers' compensation insurance.  Instead, FedEx required the Plaintiffs to pay, through deductions from their wages, for a form of insurance called "work accident insurance" (R. 48, 123, 371), which is not even covered by the workers' compensation statute.[3]  Here, FedEx required the

---

[3]    Regardless of what type of insurance was actually deducted, FedEx was prohibited under the Wage Act from making *any* deduction from the Plaintiffs' wages that does not constitute a valid set-off listed under M.G.L. c. 154, § 8. See Martins v. 3PD, Inc., 2014 WL 1271761, *8 (D.Mass. Mar. 27, 2014) ("once [the employer] elected to obtain such coverage, it was not free to transfer that cost to the drivers.").

Plaintiffs to pay, through deductions from their wages, for work accident insurance in order to <u>protect FedEx</u> from possible liability should any driver become injured on the job.[4]

Thus, FedEx's entire argument that Plaintiffs are not employees under the Workers Compensation Law is a moot point. Regardless of whether the Plaintiffs would be eligible for workers compensation, FedEx cannot demonstrate that it was authorized to deduct payments for work accident insurance from the Plaintiffs' pay.[5]

---

[4]   Although the parties have referred to this insurance as being "like" workers compensation, it is not actually workers compensation. It mimics workers compensation and thus provides protection <u>to FedEx</u> for potential liability should a driver become injured and otherwise seek to file a workers compensation claim against FedEx. Notably, this deduction for work accident insurance is virtually indistinguishable from the insurance deduction that this Court found to be prohibited in <u>Coverall</u>, 460 Mass. at 490-94. Just like FedEx, the defendant in <u>Coverall</u> misclassified its workers as independent contractors in violation of M.G.L. c. 149, § 148B, and deducted the cost of a "workers' compensation-like" insurance from their wages. <u>Awuah v. Coverall North America, Inc.</u>, 740 F.Supp.2d 240, 243 (discussing the employer-mandated insurance that mimicked workers' compensation insurance).

[5]   FedEx also attempts to distinguish <u>Coverall</u> on this point on the ground that, there, the defendant "conceded" that the workers were employees. There is no difference on this issue between this case and <u>Coverall</u>. Like here, Coverall only conceded that the

## II.  **EXPENSES**

In essence, Plaintiffs assert that FedEx's practice of requiring the Plaintiffs to pay for FedEx's operating expenses out of their own pockets reduced the Plaintiffs' wages in violation of the Wage Act.  The challenged expenses in this case are straightforward: in order to deliver FedEx's packages, the Plaintiffs each had to purchase or lease a large delivery truck that had FedEx logos emblazoned on all sides, and also pay for all necessary fuel, repairs, and tires.[6]

FedEx contends that allowing the Plaintiffs to recover these costs "would dramatically expand the Wage Act…," FedEx Br. at 2, but this claim is simply

---

workers were employees for purposes of § 148B, which it had to because that is what the District Court had ruled, just as FedEx must concede this point here based on the District Court's ruling.

[6]  FedEx claims that the Plaintiffs have not been consistent in the scope of expenses they seek to recover in this case, but this allegation is simply untrue.  Plaintiffs have consistently sought to recover the expenses that they paid in order to perform their jobs as FedEx drivers, namely, the cost of operating a large delivery vehicle, including the lease payments, insurance, fuel, and repairs (R. 45, 277), and they conceded at the District Court as well as here that they would not seek reimbursement for any expenses that FedEx did in fact expressly reimburse to them (SA. 46-47).

not correct.  This Court has time and again rejected
employers' narrow interpretations of the Wage Act,
including by striking down out-of-pocket franchise
fees and insurance payments in <u>Coverall</u>, and an
employer's attempt to impose its own ordinary business
costs on its employees in <u>Camara</u>.  The Court should
likewise reject FedEx's narrow interpretation of the
Wage Act under the same logic: FedEx did not pay the
Plaintiffs their wages free and clear, but rather
those wages were conditioned on the Plaintiffs'
assignment of a portion of those wages to third
parties for the benefit of FedEx. See <u>Salazar-
Martinez</u>, 781 F.Supp.2d at 197 (holding that "an
employer may not require an employee to bear an
expense … that is primarily for the employer's
benefit…" under state wage law that "prohibit[s] wage
deductions by indirect means where direct deduction
would violate the statute.").[7]

---

[7]     FedEx contends that no other state has
interpreted its wage statute to prohibit unreimbursed
expenses if expenses are not expressly addressed in
the statute, but the <u>Salazar-Martinez</u> decision
undermines that claim.

A.    **The Plaintiffs' Right to Receive their Full Earned Wages "Free and Clear" Is Not New**

It is illogical for FedEx to argue that the Wage Act allows employers to force their employees to redirect a portion of their wages to third parties to cover the employer's own business expenses, because as this Court recognized regarding insurance payments in Coverall, there is simply no difference between withholding an employee's wages at the time of payment and paying the wages in full but requiring the employee to channel a portion of those wages to a third party on the employer's behalf. 460 Mass. at 497 n. 22 ("[a]n employer's insurance costs, when borne by an employee, reduce wages just as effectively as if the employer had obtained the policy and deducted funds from the wages.").[8]

---

[8]    FedEx attempts to downplay footnote 22 in Coverall by arguing that it was merely dicta, but in fact that footnote permitted the plaintiffs to recover all insurance payments in that case, regardless of whether they were made out-of-pocket or through deductions in their pay. See Awuah v. Coverall, 2012 WL 910260, *1 (D.Mass. Mar. 15, 2012) (awarding a full recovery of insurance payments). Moreover, the Attorney General, whose interpretation is entitled to substantial deference, see Smith v. Winter Place LLC., 447 Mass. 363, 368-69 (2006), agrees with this interpretation. See Brief of Amicus Curiae the Commonwealth of Massachusetts, 2006 WL 6814449 (R. 304) ("requiring employees to pay for expenses incurred for the benefit of the employer … operates as

Moreover, requiring Plaintiffs to make a significant investment in a large delivery truck (plus an ongoing investment in necessary fuel and repairs) as a prerequisite to employment is directly analogous to the initial and ongoing franchise fees the workers had to pay in Coverall, 460 Mass. at 497-99 ("[i]n substance, they operate to require employees to buy their jobs from employers" and therefore "they violate public policy") (citing Justice Brandeis' dissent in Adams v. Tanner, 244 U.S. 590 (1917), that "paying for the privilege of going to work … seems foreign to the spirit of American freedom and opportunity"; also citing the language in 29 C.F.R. § 531.35 that wages an employee "kicks-back" to its employer or a third party "for the employer's benefit" are not considered to be wages paid).[9]

---

a *de facto* wage deduction."). This deference applies even when the interpretation is found in an amicus brief. See, e.g., Talk America, Inc. v. Michigan Bell Tel. Co., 131 S.Ct. 2254, 2260-61 (2011) (deferring to an agency's reasonable interpretation in an amicus brief).

[9]    Significantly, Judge Young originally held that franchise fees were not recoverable in Awuah v. Coverall North America, Inc., 740 F.Supp.2d 240, 243 (D.Mass. 2010), but before certifying the case to this Court he changed course in a related arbitration decision, holding that franchise fees were unlawful, but only if they were actually deducted from wages.

FedEx attempts to distinguish this Court's holding in Coverall regarding franchise fees because, here, the Plaintiffs paid third parties for the right to work for FedEx (*i.e.* through lease payments, fuel payments, etc.), rather than pay these fees to FedEx directly. But this distinction is entirely meaningless, as a number of courts addressing the analogous anti-kickback provision of the FLSA have recognized that payments made as a prerequisite for employment are unlawful regardless of whether they are made directly to the employer or to a third party on the employer's behalf. See infra note 18.[10]

---

When the case was sent to this Court, the plaintiffs argued that there was no logical difference between franchise fees paid out-of-pocket and franchise fees that were deducted from the workers' wages. This Court ultimately held that all franchise fees were recoverable, without drawing a distinction between those that were paid up front out-of-pocket as opposed to deducted from wages. Coverall, 460 Mass. at 497-99. On remand, Judge Young then revised his ruling accordingly, holding Coverall liable for "the total amount of the initial franchise fees and additional business fees paid by class members…." Coverall, 2012 WL 910260, *1.

[10]   See also Coverall, 460 Mass. at 498 (franchise fee payments "represent a prohibited assignment of an employee's future wages to his employer") (citing M.G.L. c. 149, § 150) (prohibiting the assignment of wages to the employer "or to any person on his behalf").

FedEx attempts to nullify the public policy concerns expressed in Coverall by arguing that the Plaintiffs earned well more than other delivery drivers in the industry.  This argument fails on two fronts.  First, it holds no water because requiring any worker to buy his or her job violates public policy regardless of the amount of compensation the job itself pays.[11]  Second, it fails because FedEx grossly overestimates the Plaintiffs' actual take-home earnings, after accounting for expenses they had to pay to perform their jobs.  For example, FedEx claims that Plaintiff Heleodoro grossed $78,811 after approximately $6,000 were deducted by FedEx[12]; but this

---

[11]  This Court has already rejected the argument that the amount of an employee's compensation affects the employee's right to recover under the Wage Act.  See Somers v. Converged Access, Inc., 454 Mass. 582, 592-93 (2009) (rejecting employer's argument that employer would get a credit for having paid the plaintiff more than he would have been paid had the employer realized it had misclassified him and was thereby violating the Wage Act); Cooney v. Compass Grp. Foodservice, 69 Mass.App.Ct. 632, 639 (2007) (finding it not relevant that plaintiffs received higher hourly rate than other employees in the food service industry).

[12]  Plaintiffs have been unable to determine how FedEx arrived at the incomes reported on its chart on page 13 of its brief, but it appears to be a method other than "reducing each Plaintiff's 1099 income by $6,000" and then reducing that figure by "each Plaintiff's … alleged IRS expenses in 2009" as FedEx explained in its brief. FedEx Br. at 12 n. 6, 13 n. 7.

number does not account for the lease payments he had
to make for his large delivery truck, as well as for
all fuel, repairs, and replacement tires that he wore
out while driving hundreds of miles each day. (R. 374,
447). Thus, it is no surprise that he reported
$41,774 in expenses that year, bringing his take-home
(pretax) pay down to $37,037 – in sharp contrast to
the $70,779 in actual income FedEx somehow claims. (R.
50-51, 77-78).[13] The same is true for all the other
Plaintiffs[14], all of whom worked long hours and drove
many miles delivering packages for FedEx.[15]

---

[13] In their briefing to the District Court,
Plaintiffs estimated their damages by reference to the
IRS mileage reimbursement rate, for ease of
calculation. (R. 337). This estimate of expenses is
likely lower than their actual expenses. To date, the
parties have only estimated the Plaintiff's expenses
and deductions, as requested by the District Court for
the purpose of exploring the categories of damages
sought in this case, and how they could be calculated.

[14] By this same analysis, after expenses, Plaintiff
Baylies took home $48,671 (before taxes), not $53,400
as FedEx claims; Duggan cleared $61,122, not $78,307;
Leduc cleared $58,492, not $74,811; Muchirahondo
cleared $39,988, not $62,148; Sangster cleared
$19,623, not $61,043; and Vitale cleared $63,455, not
$90,187. (R. 77-78).

[15] FedEx's comparison of the Plaintiffs' alleged
take-home pay to national statistics are extremely
misleading. The national statistics that FedEx cites
ignores overtime wages earned by the average delivery

FedEx's narrow interpretation of the Wage Act would give employers an enormous loophole to avoid paying their employees their full wages. For example, under FedEx's theory, the trash-pickup company in Camara, 458 Mass. at 763-65, could lawfully require its employees to purchase and maintain their own trash trucks out of their own pockets – even though such a

---

driver, thereby underestimating the average wage. See BLS website, <http://www.bls.gov/dolfaq/ bls_ques20.htm> ("Wages … are defined as straight-time … exclusive of [overtime] pay."). Although many delivery drivers receive overtime pay which would boost these average national figures (because they drive small trucks, which do not fall under the Motor Carrier Exemption for trucks over 10,000 pounds, 29 U.S.C. § 213(b)(1), M.G.L. c. 151, 1A(8)), Plaintiffs did not receive any premium for overtime (and because their trucks were generally more than 10,000 pounds, they would fall under the Motor Carrier exemption from overtime). Thus, although the Plaintiffs worked extremely long hours delivering packages for FedEx, their actual take-home earnings are comparable to, if not lower than, the average delivery driver if their pay were considered on an hourly basis.

FedEx's argument that the Plaintiffs profited from the sale of their routes (another "windfall" argument) is also misleading and incorrect. This is because not all Plaintiffs sold their routes, see, e.g., Adden. 2-3 (Adams testified that he simply took over a route from another driver); those who did were usually selling their "route" along with their truck (meaning that they were really selling their truck), see, e.g., Adden. 5 (Baylies testified that when he bought his route, he was really just buying the truck); and some drivers who did "sell their routes" had initially had to "buy their routes" for more than they later sold them, see, e.g., Adden. 5-6 (Baylies testified that he sold his "route" for less than he paid for it). (R.70, 212).

policy would have a much greater impact on its
employees' wages than the property damage chargebacks
at issue in that case.[16]

Companies should simply not be permitted to shift
their costs of running a business to their employees,
particularly where, as here, the company has done so
through the guise of classifying the employees as
independent contractors.  Just as in Crocker v.
Townsend Oil, 464 Mass. 1, 14 (2012), where this Court
held that a defendant could not obtain a release of
wage claims from a contract which did not even
identify that the worker had rights as an employee
(because he had been misclassified as an independent
contractor), here the Court should not condone FedEx's
attempt to force its employees to bear its business
expenses by virtue of an agreement in which FedEx has

_____

[16]    FedEx's reference to Judge Young's holding in
Coverall, 2012 WL 910260, *1, that the "supplies and
equipment" purchased by class members in Coverall were
not recoverable is unavailing here, both because this
Court did not address supplies and equipment, see 406
Mass. at 493 n. 20 (declining to address damages
issues other than those certified, and franchise
fees), and because Judge Young provided no reasoning
for his one-sentence holding that supplies and
equipment were not recoverable.  Moreover, the amount
in controversy was so minor that the plaintiffs simply
did not press on this issue in Coverall. 460 Mass. at
489 n. 14 (one janitor paid only $62.47 for cleaning
fluid).

incorrectly, and unlawfully, informed the employees that they are independent contractors.[17]

### B.    The Right to Recover Out-of-Pocket Expenses Is Not Standardless or Amorphous

In its brief, FedEx also attempts to resist the notion that employers cannot require employees to pay out-of-pocket business expenses on the ground that such a rule would be "amorphous and standardless" and, thus, that creation of this right is best left to the Legislature. FedEx Br. at 26-27. However, this principle is not "amorphous" or "standardless", as demonstrated by the fact that courts have regularly been called on to distinguish what expenses are for the "benefit of the employer" and what expenses are for the "benefit of the employee". As Plaintiffs have noted, regulations enforcing the federal Fair Labor Standards Act (FLSA) (which this Court cited favorably in finding that franchise fees and insurance payments violate the Wage Act, see Coverall, 460 Mass. at 497 n. 22, 498) – provide a simple and well-defined

---

[17]    In its brief, FedEx decries the Plaintiffs' attempt to invalidate its contracts with its drivers. Both Coverall and Crocker demonstrate that this Court will, when appropriate, invalidate contracts based on the Wage Act and the "important public policy considerations underlying the Wage Act." 464 Mass. at 13-14.

roadmap that courts have followed to determine which
expenses are primarily for the benefit of the employer
(and thus recoverable). In Arriaga v. Florida Pacific
Farms, LLC, 305 F.3d 1228, 1236 (11th Cir. 2002), an
FLSA case in which the Eleventh Circuit recognized
that "there is no legal difference between deducting a
cost directly from the worker's wages and shifting a
cost, which they could not deduct, for the employee to
bear," the court established a bright line rule for
determining which expenses are primarily for the
benefit of the employer versus the employee: "it is
apparent that the line is drawn based on whether the
employment-related cost is a personal expense that
would arise as a normal living expense." Id.[18]

---

[18]    The Arriaga court cited 29 C.F.R. § 531.32(a) and
(c), FLSA regulations providing that fuel and
electricity benefit the employee only when they are
"furnished for the noncommercial personal use of the
employee," while "taxes and insurance on the
employer's buildings" primarily benefit the employer
unless they are "used for lodgings furnished to the
employee." The court further explained that:
"[u]niforms provide an illustration of the dividing
line," because the cost of purchasing and maintaining
uniforms primarily benefits the employer unless the
employer "merely prescribes a general type of ordinary
basic street clothing to be worn while working and
permits variations in details of dress…," in which
case "the expense of purchasing and maintaining such
clothing is an expense an employee would encounter as
a normal living expense, and is therefore not
primarily for the benefit of the employer." Id. at

Importantly, this Court recognized in <u>Coverall</u>

that the Wage Act's prohibition against the reduction

in wages through out-of-pocket expenditures is

analogous to that the FLSA. 460 Mass. at 497 n. 22,

498 (citing 29 C.F.R. § 531.35 for the proposition

that wages are not considered paid unless they are

paid "free and clear" and not "kicked back" to the

employer or a third party "for the employer's

benefit"). Here, it is obvious that payments the

---

1243-44 (citations omitted). Other cases in which
courts have grappled with whether an expense is for
the benefit of the employer or the employee include:
<u>Salazar-Martinez</u>, 781 F.Supp.2d at 197; <u>Garcia v. Frog</u>
<u>Island Seafood, Inc.</u>, 644 F. Supp. 2d 696, 708
(N.D.N.C. 2009) ("Generally, the costs
an employer incurs purchasing and providing tools of
trade, such as the knives in this case, may not be
included in computing wages, since such items are
'primarily for the benefit or convenience of
the employer.'"); <u>Rivera v. Brickman Group, Ltd.</u>, 2008
WL 81570, *12 (E.D. Pa. Jan. 7, 2008) (agreeing with
<u>Arriaga</u>, holding that "point-of-hire transportation
[for out-of-country employees] is primarily for the
employer's benefit…"); <u>De Leon-Granados v. Eller &</u>
<u>Sons Trees, Inc.</u> 581 F. Supp. 2d 1295, 1308-10 (N.D.
Georgia 2008); <u>Bailey v. Pilots' Ass'n for Bay and</u>
<u>River Delaware</u>, 406 F. Supp. 1302, 1309 (E.D. Penn.
1976) ("I have found as a fact that the sleeping
facilities aboard the M/V Philadelphia and a shore-
side station were provided primarily for the benefit
of the Association because the Plaintiff was required
to be on duty for seven days at a time. Thus, lodging
is not includable as wages."); <u>Brennan v. Modern</u>
<u>Chevrolet Co.</u>, 363 F. Supp. 327, 333 (N.D. Texas 1973)
(automobiles used by salesmen were primarily for the
benefit of the employer).

Plaintiffs made out of their own pockets for delivery
trucks, fuel, and vehicle repairs directly benefitted
FedEx: it was FedEx that needed its customers'
packages delivered, and therefore it was FedEx that
benefitted from the Plaintiffs' out of pocket payments
for truck lease payments, fuel, tires, and repairs.[19]
It is disingenuous for FedEx to argue that, because
the Plaintiffs bought the delivery trucks in order to
perform their jobs (which FedEx required them to do),
the Plaintiffs benefitted from paying for insurance,
fuel, and repairs – when in reality it was FedEx that
unlawfully required the Plaintiffs to pay for the
trucks in the first place, and it was FedEx that
benefitted from the use and upkeep of those delivery
vehicles.[20]

---

[19]    Likewise, it was FedEx that benefitted from the
FedEx uniforms that Plaintiffs wore, the vehicle
washings that kept the delivery trucks clean and
presentable, and the electronic package scanners that
helped FedEx and its customers track the whereabouts
of their packages while in transit.  See 29 C.F.R.
§531.35 (items "specifically required for the
performance of the employer's particular work" are
primarily for the benefit of the employer).

[20]    Moreover, calculating the amount of reimbursable
expenses need not be unduly burdensome. See, e.g.,
Perrin v. Papa John's Inter., Inc., 2013 WL 6885334,
*7 (E.D. Mo. Dec. 31, 2013) (class of pizza delivery
drivers challenging employer's expense reimbursement
scheme) (holding that an expense reimbursement scheme

### C. FedEx Argues for a Theory of Damages that Runs Entirely Counter to the Well-Established Damages Principles of <u>Somers</u>

FedEx argues that under common law damages principles, it is entitled to offset any liability for failure to pay wages by the value of "certain payments and equitable interests Plaintiffs received by virtue of their contract with [FedEx]." FedEx Br. at 48.

As Plaintiffs have made clear, they agree that FedEx is not liable to the extent it explicitly reimbursed the Plaintiffs for their expenses.[21] However, it is beyond dispute under this Court's holding in <u>Somers</u> that there is no other basis for an employer to reduce its liability, including by way of asserting that the employee already received some other benefit, such as higher wages, that would make an award of damages a "windfall" at the employer's expense. <u>Somers</u>, 454 Mass. at 592 (citing <u>Cooney</u>, 69 Mass.App.Ct. at 639).[22]

---

need only "reasonably approximate[]" an employee's actual expenses) (quoting 29 C.F.R. § 778.217(a)).

[21] Plaintiffs have consistently acknowledged that the fuel supplement and daily mileage supplement were explicitly designated as reimbursements (though only partial reimbursements) for the Plaintiffs' fuel and mileage expenses. Pls.' Br. at 34-36; SA. 45-46.

## CONCLUSION

This case presents yet another creative attempt by an employer to avoid its obligations under the Wage Act. But the Wage Act prevents employers from deducting from employees' wages (unless those deductions are specifically authorized by statute), even if the Legislature could not anticipate every possible means by which employers might attempt to do so. Here, FedEx's practice of shifting the cost of operating a package delivery business onto the shoulders of its employees runs contrary to both the plain terms of the Wage Act and public policy. This Court should take this opportunity to make it clear that employers cannot use special contracts or any other means to require their employees to pay the employer's costs of running a business, whether those payments come directly out of the employees' wages, or whether they come indirectly out of the employees' wages by virtue of the employees having to pay those costs out of their own pockets.

---

22    FedEx's argument that <u>Somers</u> "was not a damages case" is somewhat baffling. FedEx. Br. at 49. The defendant's liability in <u>Somers</u> was already established in the lower court, and the only issue on appeal was whether the employee suffered any actual damages. 454 Mass. at 590.

RESPECTFULLY SUBMITTED,

Plaintiff-Appellants,

CLAYTON SCHWANN et al.,

By their attorneys,

Harold L. Lichten, BBO# 549689
Shannon Liss-Riordan, BBO# 640716
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
(617) 994-5800

Dated: August 22, 2014

### CERTIFICATE OF COMPLIANCE

Pursuant to Mass. R. App. P. 16(k), I hereby certify that this brief complies with the rules of court that pertain to the filing of briefs, including, but not limited to: Mass. R. App. P. 16(a)(6); Mass. R. App. P. 16(e); Mass. R. App. P. 16(f); Mass. R. App. P. 16(h); Mass. R. App. P. 18; and Mass. R. App. P. 20.

Signed under the penalties of perjury this 22nd day of August, 2014.

Shannon Liss-Riordan

## CERTIFICATE OF SERVICE

I hereby certify that two copies of this brief have been served on this date, by regular mail, on:

James C. Rehnquist
GOODWIN PROCTER LLP
53 State Street
Exchange Place
Boston, MA 02109

Signed under the penalties of perjury this 22nd day of August, 2014.

_____
Shannon Liss-Riordan

### ADDENDUM TABLE OF CONTENTS

Excerpts of the Deposition of Lawrence Adams.....Add 1

Excerpts of the Deposition of Jeff Baylies.......Add 4

1                  UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3                    No. 1:11-cv-11094-RGS

4     - - - - - - - - - - - - - - - - - - - - - -

5     CLAYTON SCHWANN, THOMAS LEDUC, MARVIN SANTIAGO,

6     RAMON HELEDORO, JAMES DUGGAN, ERIC VITALE,

7     MUCHIRAHONDO PHINNIAS, TEMISTOCLES SANTOS,

8     JEFF BAYLIES, ROBERT SANGSTER, individually and on

9     behalf of the class of all others similarly

10    situated,

11                         Plaintiffs,

12    vs.

13    FEDEX GROUND PACKAGE SYSTEM, INC. and FEDEX GROUND

14    PACKAGE SYSTEM, INC. d/b/a FEDEX HOME DELIVERY,

15                         Defendants.

16    - - - - - - - - - - - - - - - - - - - - - -

17

18         VIDEOTAPED DEPOSITION OF LAWRENCE ADAMS

19                   Boston, Massachusetts

20

21

22

23    Reported by:  Dana Welch, CSR, RPR, CRR, CBC, CCP

24                  Certified LiveNote Trainer

25    Job #54507

1                          L. ADAMS

2    hire helpers if you wanted to, correct?

3        A.  I might have thought that would be the

4    case, but there was helpers, I couldn't have

5    somebody drive my van.  I couldn't have somebody

6    drive it unless FedEx approved a person to drive

7    the vehicle, and I didn't realize the expenses

8    would be so much that I wouldn't be able to afford

9    to hire somebody to drive it.  I didn't understand,

10   hire somebody to drive it with what?  How would I

11   pay that person?

12          So I mean, if I was getting more money and

13   I could hire somebody, then I guess I could hire

14   somebody, but I didn't understand that I could hire

15   somebody.

16       Q.  You did, in fact, hire somebody, didn't

17   you?

18       A.  During the peak hours to work with me.

19   But not to take a day off.  How would I take a day

20   off?

21       Q.  And did you understand that you were able

22   to sell your route if you wanted to?

23       A.  To sell the route?  I didn't think I could

24   sell the route.  The routes weren't for sale.  Just

25   like Roland left, I took over his route.  Who would

Page 54

1                              L. ADAMS

2    buy the route when they could just get hired and

3    get a route basically.  I mean, I didn't think I

4    could sell the route.  I didn't see anybody sell a

5    route.

6         Q.  And did you try to negotiate any part to

7    this operating agreement?

8         A.  Negotiate a part?  No, not that I

9    remember.

10        Q.  Now, do you recall signing addendum or an

11   addenda to this operating agreement?

12        A.  Yes.

13        Q.  Did you sign one every year?

14        A.  Yes.

15        Q.  And did you renew the contract every year?

16        A.  Well, they certainly made it seem like a

17   pay increase.  It was like if you was in a job, you

18   would get a pay increase and you would come and you

19   would sign a paper saying if you want more money

20   per package, sign this.  That's what I figured it

21   was.  But every year I signed the pay increase type

22   of deal, addendum.

23        Q.  And did you sign a new contract every

24   year?

25        A.  I didn't take it as signing a new contract

Page 1

JEFF BAYLIES

1

2             UNITED STATES DISTRICT COURT

3               DISTRICT OF MASSACHUSETTS

4                    No. 1:11-cv-11094-RGS

5    - - - - - - - - - - - - - - - - - - - -

6    CLAYTON SCHWANN, THOMAS LEDUC, MARVIN SANTIAGO,

7    RAMON HELEDORO, JAMES DUGGAN, ERIC VITALE,

8    MUCHIRAHONDO PHINNIAS, TEMISTOCLES SANTOS, JEFF

9    BAYLIES, ROBERT SANGSTER, individually and on

10   behalf of the class of all others similarly

11   situated,

12                    Plaintiffs

13        vs.

14   FEDEX GROUND PACKAGE SYSTEM, INC. and FEDEX GROUND

15   PACKAGE SYSTEM, INC. d/b/a FEDEX HOME DELIVERY,

16                    Defendants

17   - - - - - - - - - - - - - - - - - - - -

18            DEPOSITION OF JEFF BAYLIES

19       Tuesday, October 9, 2012   10:20 a.m.

20            Goodwin Procter, LLP

21       Exchange Place, 53 State Street

22            Boston, MA 02109

23   Reported by:

24   Janet McHugh, RMR, CRR, CLR

25   JOB NO. 54142

Page 50

JEFF BAYLIES

1

2      Q.    Did you reach out to her?

3      A.    She was in the terminal, so he made an

4  introduction.

5      Q.    What did you speak about with her when

6  you talked to her?

7      A.    How much it was going to cost to take

8  over her truck.

9      Q.    Were you purchasing her truck and her

10  route or just her truck?

11      A.    It was more just of the truck.

12      Q.    But she was stopping working as a

13  contractor with FedEx Ground?

14      A.    Yes.

15      Q.    And you were going to ultimately take

16  over her route?

17      A.    I took over a route.  I don't know if it

18  was her area.

19      Q.    What is the difference?

20      A.    I don't know if she was doing this area

21  that I took over.  I don't know if that's clear.

22      Q.    What area did you take over?

23      A.    I was doing like a Middleboro, Carver

24  area.  And I think she was doing Fall River at the

25  time.

ADD. 5

Page 51

JEFF BAYLIES

1

2      Q.   After she left, do you know who

3   continued to do the Fall River area?

4      A.   No.

5      Q.   So when you were negotiating her -- with

6   her, you said the cost -- how much was the cost?

7      A.   It was 25,000.

8      Q.   And did you negotiate that amount?

9      A.   No.

10      Q.   That was just the amount she said she

11   wanted?

12      A.   Mm-hmm.

13      Q.   And is that the price you ultimately

14   paid?

15      A.   Right.

16      Q.   Did you finance that?

17      A.   Yes.

18      Q.   And how did you do that?

19      A.   I took out a loan at Southern Mass.

20   Credit Union.

21      Q.   How much was the loan for?

22      A.   $23,000.

23      Q.   So did you put $2000 down?

24      A.   Yes.

25      Q.   Do you recall what the payments were on

Page 190

JEFF BAYLIES

1

2    Bates number BAY16.  At the top, it says Jeff

3    Baylies, 188 Hudson Street, New Bedford,

4    Massachusetts.  Can you let me know if you

5    recognize this document?

6        A.    Yes, I do.

7        Q.    What do you recognize it to be?

8        A.    This was the sales agreement that I had

9    with -- while I was with Hector and this Richard

10   Brown to sell my route.

11       Q.    Were Hector and Richard Brown in

12   business together?

13       A.    Right.

14       Q.    Did they have a company called Brown

15   Transportation?

16       A.    I'm not sure what was going on with

17   those two.  But I think they were together, and

18   then after -- when they finally got -- then they

19   split up after the ISP.

20       Q.    But you stayed on working for Hector?

21       A.    Correct.

22       Q.    Did you draft this document?

23       A.    Yes.

24       Q.    And the 2003 Chevrolet Express truck,

25   that's the truck we've been talking about that was

ADD. 7

Page 191

1          JEFF BAYLIES

2   your primary vehicle while you were a contractor?

3          A.    Yes.

4          Q.    And did that $20,000, that included

5   payment for both the vehicle and the route?

6          A.    That's how I worded it, yes.

7          Q.    Did you have an amount divided up in

8   your head what was for the route and what was for

9   the vehicle, or it was just a sum total?

10         A.    I figured the truck -- it was just a sum

11   total.

12         Q.    So after you sold your route to Hector,

13   Brown Transportation Corp., did you immediately

14   start working as a driver for him?

15         A.    I think we still stayed on working for

16   FedEx for a few weeks in between there, and then I

17   started with him.   Yes.

18         Q.    And why did you decide to stay on doing

19   the same route and delivery driving, rather than

20   just go do something else entirely?

21         A.    Just kind of in a rut, stuck in my ways,

22   and I knew the area.   And I thought I might just

23   stay on for a little while until I figured out

24   what I was going to do.

25         Q.    And you mentioned getting paid $750 a